UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HELDER SANTOS

                                          Plaintiff(s)

                    -Against-

PSYCHEMEDICS    CORPORATION,    KEECHANT    L.

SEWELL, as Police Commissioner of the City of New York, THE

POLICE DEPARTMENT OF THE CITY OF NEW YORK, THE

CITY OF NEW YORK, and RYAN PAULSEN, individually and

in his official capacity as Senior Analytical Chemist for Mass

Spectrometry for Psychemedics Corporation,

                                          Defendant(s)

------------------------------------------------------------X

| COMPLAINT |
|-----------|
| Case Number: |
| Plaintiff demands a jury trial on all asserted claims. |

        Plaintiff HELDER SANTOS, by his attorneys, Yassi Law PC, complaining of the

Defendants, alleges as follows:

I.    NATURE OF THE ACTION

        1.    This action seeks redress against Defendants City of New York; New York City

Police Department; Keechant Sewell, as Police Commissioner of the City of New York;

Psychemedics Corporation; and Ryan Paulsen, individually and in his official capacity as Senior

Analytical Chemist for Mass Spectrometry for Psychemedics Corporation, for the arbitrary

termination and irreparable reputational harm suffered by Plaintiff Helder Santos, a decorated

New York City police officer, who was disciplined and ultimately dismissed from the NYPD

on the basis of a single, uncorroborated hair drug test performed by Defendant Psychemedics

Corporation (the NYPD's exclusive forensic testing agent) even as overwhelming scientific

evidence, admissions under oath, and government studies demonstrate that such testing is fundamentally incapable of distinguishing between drug ingestion and routine environmental contamination.

2.    Despite public proclamations that its testing methodology "excludes false positives" from contamination and is validated by the FBI and judicial precedent, Defendants, acting in willful concert and disregard of established scientific limitations, relied on results which their own experts and cited studies admit are not probative of intentional drug use. This action challenges not merely the flawed disciplinary decision but the validity, transparency, and integrity of the entire testing protocol and state-private joint enterprise under color of state law, that deprived Plaintiff of his career, his rights, and fundamental fairness despite a partial fact finder employed by the City of New York finding Plaintiff **not guilty** by a preponderance of the evidence of the alleged drug use following a robust NYPD administrative trial.

3.    As a direct result of Defendants' negligent, reckless, and unconstitutional conduct, Plaintiff suffered significant professional, reputational, and emotional harm, including loss of employment opportunities, damage to his standing in the law-enforcement community, and deprivation of rights secured under the United States Constitution, the New York State Constitution, and applicable state and federal law.

II.    <u>JURISDICTION AND VENUE</u>

4.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

5.    This Court may exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367.

6.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)(2), as

Defendants reside and/or do business in this district and the events giving rise to Plaintiff's claims occurred in this district.

7.      Plaintiff filed his Notice of Claim upon Defendant City of New York by delivering copies of the notice to the person designated by law as a person to whom such claims may be served.  Such Notice of Claim was in writing; sworn to by Plaintiff; set forth the nature of the claim, the time, place, and manner by which the claim arose; and the damages and injuries claimed to have been sustained by Plaintiff.

8.      Following a 50-H Hearing, Defendants neglected to adjust the claims within the statutory time period.

III.    <u>PARTIES</u>

9.      Plaintiff, is a citizen of the United States of America and was a citizen of the State of New York at all times pertinent to this Complaint. Following his successful completion of an open, competitive civil service examination, Plaintiff was duly appointed a Police Officer in the Police Department of the City of New York and took the Oath of Office prescribed by Article XIII §1 of the New York State Constitution on July 1, 2004, and was a New York City Police Officer in the competitive class of civil service of the City of New York at all times pertinent to this Complaint.

10.     Defendant, KEECHANT L. SEWELL, is formerly the Police Commissioner of the City of New York (hereinafter "Commissioner Sewell") and exercised the powers, responsibilities, and duties of that office until June 30, 2023.

11.     Defendant, THE CITY OF NEW YORK, is a duly established City of over one million inhabitants, as the term is defined in the Laws of the State of New York and is a duly organized municipal corporation in the State of New York (hereinafter "City of New York").

Defendant, the City of New York, was at all relevant times, Plaintiff's public employer.

12.    Defendant, THE NEW YORK CITY POLICE DEPARTMENT ("NYPD" or "Department" and collectively with the City of New York and Commissioner Sewell, the "NYC Defendants"), is the duly authorized agency responsible for the maintenance of law and order within the geographic confines of Defendant, the City of New York.  It functions as the direct manager and disciplinary authority for Plaintiff and for all other New York City Police Officers, and maintains its principal place of business at One Police Plaza, New York, New York 10007.

13.    Defendant, PSYCHEMEDICS CORPORATION ("Psychemedics") is a Delaware corporation conducting business in the State of New York.

14.    Defendant, RYAN PAULSEN ("Paulsen" and together with Psychemedics, the "Psychemedics Defendants") is an individual residing in the State of Texas who conducts business in the State of New York, including with respect to providing expert witnesses testimony on behalf of the NYC Defendants in NYPD disciplinary matters.

IV.    <u>STATEMENT OF FACTS</u>

a.    <u>**Officer Santos' Background and Record as an NYPD Police Officer**</u>

15.    Following his successful completion of an open, competitive civil service examination, Plaintiff was duly appointed a Police Officer in the Police Department of the City of New York and took the Oath of Office prescribed by Article XIII §1 of the New York State Constitution on July 1, 2004, and was a New York City Police Officer in the competitive class of civil service of the City of New York at all times pertinent to this proceeding.

16.    For the entirety of his career, Plaintiff was an exemplary police officer, receiving awards and commendations from the Department and community members.

17.    Plaintiff was known to his colleagues and supervising officers as a diligent,

honest, and community-focused member of the force. In 2013, Plaintiff courageously aided in the rescue of two teens who had fallen into the East River, putting his own life in peril due to the nature of the rescue.[1]

18.     In 2020, the President of the 112th Precinct Community Council awarded Plaintiff a Certificate of Appreciation as a thank you for his efforts to the community.

19.     At no point did Plaintiff exhibit any signs of drug use, either in his personal life or work life. Prior to the drug test in question which occurred on April 19, 2021, Plaintiff had tested negative on at least five other Department drug tests.

### b. **The False Positive**

20.     On February 26, 2020, Plaintiff was promoted to the position of NYPD Sergeant. As a result of the promotion, Plaintiff was subject to a one-year probationary period, which required him to submit to a Department drug test on January 5, 2021 ("January 5, 2021 Negative NYPD Drug Test"). This test was negative for the presence of cocaine (and all other drugs).

21.     Less than four months later, on April 19, 2021, Plaintiff knowingly and voluntarily submitted to a non-random Department drug screening test to transfer to the Highway Patrol Unit. The drug test was performed by Defendants collecting and analyzing hair samples taken from multiple locations of Plaintiff's leg—a test he could have chosen to put off if he was worried about the potential results ("April 19, 2021 Department Drug Test"). On such date Plaintiff, submitted three leg hair samples to the Department in connection with a drug test associated with his transfer to a specialized unit: *A-Sample, B-Sample* and *C-Sample* (collectively, the "Samples"). The A- and B-Samples were reported to Defendant NYPD by

---

[1] See Jessica Simeone, Two teens who fell into East River saved by cops New York Post (2013), https://nypost.com/2012/12/08/two-teens-who-fell-into-east-river-saved-by-cops/ (last visited October 31, 2025).

Defendant Psychemedics as positive for the presence of cocaine and **_only one_** of the cocaine metabolites, benzoylecgonine ("BE").

22.    On or around April 27, 2021, Plaintiff was immediately suspended from the NYPD for failing the April 19, 2021 Department Drug Test, and Defendant NYPD issued disciplinary charges against Plaintiff under Disciplinary Case 2021-23403 for allegedly wrongfully ingesting and possessing cocaine ("Charges").

23.    Plaintiff immediately sought independent drug testing, including via fingernail and toenail samples, and other hair testing, and consistently tested negative. These included (collectively, "Independent Negative Tests"):

   a)  April 29, 2021 – Head Hair by Psychemedics, Negative results

   b)  May 10, 2021 – Finger Nails by Expertox, Negative results

   c)  July 7, 2021 – Head Hair by Psychemedics, Negative results

   d)  July 28, 2021 – Chest Hair by USDTL, Negative results

   e)  July 28, 2021 – Toe Nails by USDTL, Negative results;

   f)  October 13, 2021 – Head Hair by Psychemedics, Negative results; and

   g)  January 10, 2022 – Head Hair by Psychemedics, Negative results.

24.    In connection with the Charges, on August 18, 2021, Plaintiff was demoted from his position as Sergeant to his prior civil service title of Police Officer.

### c.  The Department Trial

25.    Over the course of the months following the demotion, Assistant Deputy Commissioner of Trials Josh Kleiman ("ADC Kleiman") presided over a hearing before the city's Office of Administrative Trials and Hearings (the "Department Trial"), which took place across six days in December of 2021 and January and February of 2022. Crucially, the trial

revealed substantial evidence, including testimony from the parties and representatives of the Defendants, demonstrating the defective and unreliable nature of Psychemedics' drug testing tools and procedures as it pertains to cocaine use testing, as well as undisputed evidence of the Independent Negative Tests and the January 5, 2021 Negative NYPD Test.

26.    At the Department Trial, Plaintiff vigorously demonstrated his innocence, despite the NYPD bearing the burden of proof. During Plaintiff's case in chief, he called the following witness:

   a) *Police Officer Daniel Lee, Police Officer James Yule, and Sergeant Christopher Ottomanelli* testified as to Plaintiff's exemplary character and the shocking nature of the allegations, which were at odds with Plaintiff's work and personal life;

   b) *Dr. David Kidwell[2] and Dr. Ernest Lykissa[3]*, each as expert witnesses;

   c) *Ms. Erin Randazzo*, who laid the foundation for the evidentiary admission of certain Independent Negative Drug Tests in the Department Trial record; and

   d) *Plaintiff Helder Santos*, testifying on his own behalf, explained the shocking nature of the test results, especially since he knew about the impending drug test and voluntarily submitted to it.

   *Overview of Adjudicated Findings*

---

[2] Dr. Kidwell has a Ph. D. in Organic Chemistry, has been a research chemist at the Naval Research Laboratory for 37 years, has published well-over a dozen articles in forensic science journals on the subject of hair drug testing, many of which concern cocaine, has been qualified as an expert in the area of hair testing for cocaine at least a dozen times and has never been rejected as an expert, has testified before Congress on the subject of drug testing, and has assisted SAMSHA in writing regulations regarding drug testing in the federal workplace.

[3] Dr. Ernest Dimitri Lykissa was qualified as an expert in forensic toxicology. Dr. Lykissa has a Bachelor of Sciences and Masters of Science in Microbiology and a Ph.D. in Molecular Pharmacology. He has been employed in the fields of toxicology and pathology since 1980 and founded ExperTox in 2000. His duties as a Laboratory Director are to ensure that the lab functions in accordance with the criteria established for forensic and clinical laboratories by the College of American Pathologists and the Texas Forensic Science Commission. He has testified as a forensic toxicologist for federal government agencies, including the FBI "numerous times." He has also been qualified as an expert in forensic toxicology in "a number of states, including New York."

27.     While the amount of cocaine ingested must be significant to reach the cutoff imposed by Defendants for a failed drug test, the amount of cocaine that can contaminate hair follicles to cause a positive result just above the cutoff (5ng/10mg) is vanishingly small and invisible to the human eye (1 teaspoon of pure cocaine, for instance, contains approximately 5 billion nanograms of cocaine). Accordingly, if the hair is externally contaminated with an imperceptible quantity of cocaine, a positive test could result if the contamination is not removed prior to testing.

28.     Hair, unlike urine, blood, saliva, and sweat, remains outside the body for a substantial period of time before being collected for a drug test. Body hair stays on the body for an average of six to seven months before falling out. The time window for external contamination is therefore long.

29.     Defendant Psychemedics' workplace drug testing is "designed" with the goal to distinguish drug users from people accidentally exposed to a drug, a task that the scientific community agrees cannot be achieved with any degree of certainty. This is especially important for NYPD employees who can come in contact with cocaine during the course of their law enforcement responsibilities.

30.     Defendant Psychemedics aspires to achieve these ends through the application of several features: (1) washing techniques and procedures designed to remove external contaminants, (2) identification of unique metabolites to prove the drug was ingested by the donor, specifically, benzoylecgonine (BE), norcocaine (NC) and cocaethylene (CE), and (3) applying cutoffs that are likely only to be exceeded by way of regular use of the substance or by the ingestion of a substantial quantity of the drug—or as explained by Plaintiff's expert witnesses, external contamination. Each of these tripartite quality control features must be met

in order for a Department drug test to be reported as positive. A hair sample, for example, may be found to contain a high level of a drug, which exceeds the cutoff, but if it does not contain any of the unique metabolites of the drug, Defendant Psychemedics would purportedly report the sample as a negative.

### *Plaintiff's A-, B- and C- Sample Test Results*

31.     Defendant Psychemedics testing of the A- and B-samples found 5.95 nanograms (ng) and 6.54 ng of cocaine (COC) per 10mg of hair, respectively—both just marginally above Defendant Psychemedics self-imposed 5 ng/10mg "cut-off."

32.     The A-sample also tested positive for the main cocaine metabolite, benzoylecgonine (BE), at 0.65 nanograms per 10 milligrams. The cutoff for BE is 5% of the cocaine amount. If it were found to be less than 5% of the cocaine amount, the test result would have then been reported as a negative. Here, the BE amount was nearly 11% of the cocaine amount. The A-sample did not contain reportable amounts of norcocaine (NC) or cocaethylene (CE).

33.     The B-sample also tested positive for benzoylecgonine (BE) at 0.77ng/10mg. The BE amount in the B-sample was nearly 12% of the cocaine amount. The B-sample was also found to contain NC at 0.58ng/10mg but did not contain reportable amounts of cocaethylene (CE). Defendant Paulsen testified that a positive for norcocaine (NC) is not determinative of ingestion. Moreover, there was no evidence in the record that a positive for NC in conjunction with a positive for BE is determinative of ingestion either.

34.     Plaintiff availed himself of the option of having his C-sample tested by another laboratory. On May 7, 2021, Plaintiff's C-sample was sent to Quest Diagnostics laboratory. Quest Diagnostics found 22.55 nanograms COC per 10 milligrams—nearly 3.6 times higher

than the results found by Defendant Psychemedics in the A- and B-samples.

35.    Each expert at the Department Trial unequivocally agreed that such a significant disparity was unusual. Plaintiff's expert witnesses, Dr. Kidwell and Dr. Lykissa, stated that this disparity was strong evidence of external contamination, as it could not be explained by expected differences in testing results due to the homogeneous nature of the samples. Findings by ADC Kleiman further supported their expert opinions that no prior NYPD disciplinary case had ever featured a disparity of this magnitude between split laboratory results, and in fact, Quest Diagnostic's results in comparable cases were often equal to or lower than those produced by Psychemedics.

### Plaintiff's Independent Negative Tests

36.    On January 5, 2021, four and a half months prior to the April 19, 2021 Department Drug Test, Plaintiff submitted to a Department drug test in connection with his promotion from police officer to sergeant. ***The results were negative for cocaine.***

37.    On April 29, 2021, two days after Plaintiff was informed of the positive NYPD results, he arranged for a private drug test, submitting a head hair sample to LabCorp, which by coincidence was outsourced to Defendant Psychemedics. ***The results of this independent test, performed by the same lab only eight days later, were negative for cocaine***. The parties stipulated to the admission of a video showing the collection of Plaintiff's hair on April 29, 2021 and the results of the test were admitted in evidence.

38.    On May 10, 2021, Plaintiff traveled to RaBu Diagnostics, a drug testing collection facility in Garden City, NY, for the taking of fingernail clippings and shavings. Plaintiff's fingernail sample was sent to ExperTox laboratory in Deer Park, TX, for testing. ***The results were negative for cocaine.*** Dr. Lykissa, the laboratory director of ExperTox testified at

trial and the results of the test were admitted in evidence.

39.     Other than the aforementioned drug tests, Plaintiff testified that on July 28, 2021, he submitted chest hair and toenail samples to Paymer Associates, a drug testing collection company in Connecticut, and the samples were sent to United States Drug Testing Laboratories for testing. ***The results were negative for cocaine***.

40.     In addition to these drug tests, Plaintiff further testified that following the disputed April 19, 2021 Department Drug Test, he consistently undertook independent drug testing of his own initiative. Specifically, Plaintiff testified that he submitted hair samples to U.S. Drug Testing, LabCorp, tested by Psychemedics every couple of months, on July 7, 2021, October 13, 2021, and January 10, 22. ***The results were negative for cocaine***.

41.     Accordingly, it was undisputed at the Department Trial that each of Plaintiff's Independent Negative Tests and January 5, 2021 Negative NYPD Test were all negative for cocaine (or any other drug).

### *Significance of the Combined Look Back Periods*

42.     Plaintiff's expert witnesses, Dr. Kidwell and Dr. Lykissa, both highly credentialed in forensic toxicology, established that the scientific consensus regarding drug "look-back" periods[4] for hair and nails meant that collectively Plaintiff's negative results left no viable time span in which regular or even isolated drug use could have occurred undetected between July 2020 and May 2021.

---

[4] A "look-back" period refers to the maximum length of time a drug test can detect past drug use based on the biological sample analyzed. For example, head hair drug testing typically has a look-back period of up to 90 days, meaning drugs ingested within the past three months may be detected in head hair, while body hair and nail testing can sometimes detect drug use over an even longer period, often up to six months or more depending on body and nail growth rates. The look-back period is determined by the rate at which hair or nails grow and retain chemical traces, and it is central to establishing the timeframe in which drug use could be reliably detected by forensic testing. *See* Society of Hair Testing consensus on general recommendations for hair testing and drugs of abuse testing in hair. *Drug Test Anal.* 2023 Sep;15(9):1042-1046, *available online at* https://pubmed.ncbi.nlm.nih.gov/37332075/ (last visited October 31, 2025).

43.     As illustrated below, Plaintiff's Independent Negative Tests and January 5, 2021 Negative NYPD Test, which collectively analyzed fingernails, toenails and leg, head and chest hair, covered all relevant "look-back" periods.



44.     The weight of expert testimony and the overlapping detection periods together established, **_to a scientific certainty_**, that Plaintiff did not use cocaine or other drugs at any point relevant to the Defendants' allegations. The consistency and comprehensiveness of these negative findings rule out not only frequent but also one-time use, confirming that the lone positive was an anomaly inconsistent with the objective biological record.

### *Department's Rebuttal – The Botched Retest for Hydroxycocaines*

45.     During the Department Trial, the reliability of the Department's cocaine metabolite evidence came into sharp question. Defendants' main scientific authority at trial—a

principal study conducted by the FBI (the "2014 FBI Study")[5], with methodological input and assistance from Defendant Psychemedics itself—specifically concluded that BE or the BE/cocaine ratio is not a valid indicator for differentiating ingestion from contamination in hair samples.

46.    The 2014 FBI Study authors stated that "there appears to be little utility in measuring BE or BE/cocaine ratios in hair," and unequivocally held that application of BE markers could not reliably establish ingestion in workplace drug testing. Notably, at trial, all parties, including Defendant Paulsen and Plaintiff's experts, agreed that, under the 2014 FBI Study's published criteria, Plaintiff's results placed him squarely in the "contamination" rather than "ingestion" category.

47.    Defendant Paulsen admitted at the Department Trial that BE is not only capable of formation outside the body, but that Defendant Psychemedics' BE cutoff does not rule out external BE formation.[6] This was despite hours of Defendant Paulsen's testimony bolstering its BE testing as infallible proof of ingestion.

48.    Facing the weakness of its BE-based case, Defendant NYPD falsely represented at the outset of its rebuttal that sufficient reserve hair from the A-sample and B-sample remained to be tested for another category of cocaine metabolites known as hydroxycocaines, of which there are three, identified by their prefixes: *meta-, ortho-, and para-*. The NYC Defendants claimed that it had an ethical obligation to test for these metabolites since Defendant Paulsen voluntarily informed them that if Plaintiff's samples were negative for the presence of hydroxycocaines, Plaintiff's results would no longer be consistent with ingestion. This itself

---

[5] *See* Morris-Kukoski, C. L., Montgomery, M. A., & Hammer, R. L. (2014). Analysis of extensively washed hair from cocaine users and drug chemists to establish new reporting criteria. *Journal of Analytical Toxicology*, 38(9), 628–636, *available online at* https://pubmed.ncbi.nlm.nih.gov/25100648/ (last visited October 31, 2025).
[6] Indeed, when Plaintiff's B-sample was re-tested for hydroxycocaines after sitting in a lab locker for nearly 8-months the BE concentration increased by 22% from the level recorded in the April 2021 results.

highlights the defective nature of the Defendant's testing protocols.

49.    The NYC Defendants had never previously used hydroxycocaine testing as part of their standard forensic protocols for cocaine cases, a fact Defendant Paulsen himself acknowledged. Apart from a single postal worker case, Defendant Paulsen was unaware of ***any*** prior employment context in which hydroxycocaine results had been deemed dispositive. According to Defendant Paulsen's testimony, hydroxycocaine testing had not been widely adopted for routine workplace drug testing due to cost, lack of industry-wide guidelines, and limited scientific consensus on cutoffs and interpretive standards. [7]

50.    Plaintiff begrudgingly agreed to the hydroxycocaine retesting solely for the purposes of exoneration and based primarily on the representations made by the Defendants at the Department Trial that there were sufficient reserves to test the A-sample and B-sample in accordance with the NYC Defendants' protocols for police officer drug testing. Namely, that his A-sample would be tested first, and if and only if the A-sample was positive, the B-sample would then be tested to verify the results.

51.    When the hydroxycocaine test returned a purportedly positive result, two troubling issues came to light:

  a)    First, the Defendants flipped course, insisting that such a result was sufficient evidence to prove ingestion despite just days prior testifying that hydroxycocaine testing had not been widely adopted for routine workplace drug

---

[7] The only mention of hydroxycocaines in the 2020 SAMHSA Guidelines is as follows: In addition, although hydroxylated metabolites of cocaine and benzoylecgonine do not meet the Guidelines definition of a unique metabolite for hair, these analytes have been touted in the literature as being diagnostic of cocaine use when ratio criteria are applied to the quantitative results. Hydroxy-metabolites of cocaine were originally thought to be unique metabolites as defined in the HMG, until these compounds were identified in street cocaine samples and found to be produced during hair treatment experiments. More recently, hydroxy-metabolites of benzoylecgonine were identified in hair and thought to represent a new opportunity to reliably identify cocaine use. However, these analytes also have been detected in a limited study of street cocaine samples, and were found to form and increase in concentration over a period of eight weeks after contamination of seven subjects' hair with cocaine.

testing and indicating that such results would be used solely for purposes of exoneration under the false pretense of an "ethical obligation."

b) Secondly, despite representations made by Plaintiff to the contrary, only the B-Sample from Plaintiff's reserve specimens was available for hydroxycocaine testing because Defendant Psychemedics intentionally or negligently spilled the A-Sample prior to analysis.

52.    Regarding the first issue, no scientific consensus supported the Defendants' interpretation that such a result was sufficient evidence to prove ingestion. In fact, Defendant Paulsen admitted that "at present there is not a consensus guideline" on how to test or apply the results of hydroxycocaine metabolites.

53.    Additionally, the B-Sample tested positive for *ortho*-hydroxycocaine—a metabolite that, according to Plaintiff's expert Dr. Kidwell, "can only come from a chemical degradation of the cocaine molecule" and "cannot come from the human body." Dr. Kidwell testified that the presence of *ortho*-hydroxycocaine was "prima facie" evidence that the hair sample was contaminated. [8]

54.    Dr. Kidwell further explained that when cocaine undergoes external chemical degradation (as occurs during environmental contamination), it produces all three hydroxycocaine isomers (*para-, meta-*, and *ortho-*) in varying ratios depending on the degradation pathway—as opposed to the ratios expected from metabolic processes within the human body, which were not present in such result.

---

[8] Several well-cited peer-reviewed studies support Dr. Kidwell's position that *ortho*-hydroxycocaine is not produced metabolically in significant amounts in the human body and that its presence in this context is considered prima facie evidence of hair sample contamination, particularly from peroxide exposure or environmental sources rather than cocaine ingestion. *See, e.g.*, Franz T, Scheufler F, Stein K, Uhl M, Dame T, Schwarz G, Sachs H, Skopp G, Musshoff F. 2018. Determination of hydroxy metabolites of cocaine from hair samples and comparison with street cocaine samples. Forensic Sci Int. 288:223–226, *available online at* https://gtfch.org/cms/images/stories/media/tk/tk84_3/Franz_et_al_2017.pdf (last visited October 31, 2025).

55.    Furthermore, Defendant Paulsen's own studies had shown that hydroxycocaine concentrations were 4-5x times higher in body hair than head hair, a phenomenon Paulsen attributed vaguely to "growth rates" without providing a scientifically validated explanation. Unsurprisingly, Defendants, however, were unwilling to provide a cutoff that was 4-5x higher; a commonsense conclusion given that the B-sample was a body hair sample, rather than a head hair sample.

56.    Moreover, Defendant Psychemedics' negligent spilling of the A-sample, followed by moving forward with the retest anyway, fundamentally violated the NYC Defendants' protocols guaranteeing officers the right to duplicate sample verification—a safeguard expressly designed to ensure fairness and accuracy. Furthermore, Plaintiff's A-sample, when originally test, was the least positive for Defendants' alleged markers of cocaine ingestion; given that Plaintiff barley exceeded the Defendants' cut-offs, testing of the A-sample was Plaintiff's best chance of exoneration. Therefore, the loss of the A-sample, and Plaintiff's detrimental reliance on the representation of the Defendants to the contrary, deprived Plaintiff of the chance of being exonerated and directly undermined the reliability of the findings.

57.    Even more troubling, upon information and belief, Defendants knew the results of Plaintiff's hydroxycocaine testing prior to requesting Plaintiff's "permission" to proceed with such test. The record undeniably supports such a conclusion, and Defendant NYPD did not deny that the retest had been initiated prior to obtaining permission from Plaintiff. Accordingly, Defendants, acting in concert, coaxed Plaintiff into agreeing to a retest for the purpose of bolstering their case under the guise of an "ethical obligation".

### d.  ADC Kleiman's Report and Recommendation

58.    In his official Report and Recommendation to Defendant Commissioner Sewell,

dated June 17, 2022 ("Kleiman Report"), ADC Kleiman made a clear and reasoned finding: the "record failed to establish by a preponderance of the evidence that [Plaintiff] wrongfully possessed or ingested cocaine. Accordingly, [Plaintiff] is found Not Guilty of the charged misconduct."

59.    Following the issuance of the Kleiman Report, Plaintiff timely submitted a letter to Defendant Commissioner Sewell pursuant to *Fogel v. Board of Education*, 48 A.D.2d 925 (2d Dept. 1975), affirmatively requesting that Defendant Commissioner Sewell accept ADC Kleiman's factual and legal findings.

60.    Plaintiff's letter accurately summarized and reiterated the evidence elicited at trial: that Plaintiff was an NYPD member in good standing for over 17 years with an unblemished service record and had previously tested negative on at least five separate NYPD drug tests, including every test before the April 19, 2021 incident and all of the Independent Negative Tests.

61.    The Kleiman Report made clear that the Charges arose from a single disputed hair drug test in which only benzoylecgonine (BE) was detected above the NYPD's internal cutoff criteria. At trial, it was unequivocally established through expert testimony from both Plaintiff and the Department's own expert, Defendant Paulsen, that BE is not a reliable or unique marker of cocaine ingestion, as it is widely known in scientific literature, including the 2014 FBI Study, and accepted at trial that BE can be formed outside the body, including through environmental contamination and degradation after sample collection.

62.    ADC Kleiman, summarizing both law and science, expressly recognized the special imperative for NYPD workplace testing "to distinguish drug users from persons accidentally exposed to a drug. This is especially important for NYPD employees who can come

in contact with cocaine during the course of their law enforcement responsibilities."

63.    In light of all evidence—including uncontradicted expert testimony, the undisputed scientific consensus adopted by the FBI and referenced by Psychemedics itself, and the unique factual circumstances of Plaintiff's case—ADC Kleiman concluded: "**the Department, upon the unique circumstances presented in this disciplinary matter, has failed to prove that the testing of [Plaintiff's] April 19, 2021 hair samples sufficiently distinguished between ingestion and external contamination.**"

64.    For the next five months, Plaintiff continued working as an NYPD Police Officer. Plaintiff was elated that he and his family would no longer have to bear the thought of his termination and the associated financial hardships of his loss of pension benefits. As the Department Trial dragged on for 14 long months, Plaintiff and his wife faced the daunting reality of how they would make ends meet if he were to be terminated. His salary was the only source of income for the family, and his wife had been a stay-at-home mom to their two children for the past 9 years, who were being homeschooled due to COVID-19-related health concerns. The thought of the financial hardships that would be imposed on their family kept them up at night, causing immense stress and anxiety. On November 3, 2022, this nightmare became a reality, and Plaintiff's family was left to deal with the crushing blow of losing their only source of income.

e.    **The Judge, Jury and Executioner: Arbitrary Deviation from Established Disciplinary Process and Disregard for Due Process**

65.    On November 3, 2022, without conducting any independent evidentiary hearing, taking additional testimony, or providing Plaintiff with any opportunity to be heard, Defendant Commissioner Sewell inexplicably disapproved ADC Kleiman's Report and Recommendation

("Sewell Memorandum"), noting that Plaintiff had failed the Department's drug testing and was therefore guilty of the charges against him and "in accordance with the NYPD's Disciplinary System Penalty Guidelines" ("NYPD's Disciplinary Guidelines"), immediately dismissed Plaintiff from the NYPD.

66.    The NYPD Disciplinary Guidelines were adopted on January 15, 2021, as a result of a blue-ribbon panel of judges and former prosecutors recommending that the NYPD consider a discipline matrix to outline the presumptive penalties for a wide variety of possible offenses, and delineating more specifically how both mitigating and aggravating factors may affect the ultimate penalties imposed.

67.    The Sewell Memorandum provided no meaningful analysis of the extensive evidence presented at the Department Trial. Instead, Defendant Commissioner Sewell relied exclusively on the bare fact that Defendant Psychemedics had reported a positive drug test, dismissing without explanation the ADC Kleiman's detailed findings regarding scientific reliability, environmental contamination, and Plaintiff's extensive exculpatory evidence.

**Failure to Consider the Entire Record in Violation of Applicable Law**

68.    Defendant Commissioner Sewell failed to consider the entire record and relied solely on the April 19, 2021 Department Drug Test in violation of 38 RCNY § 15-08(a) requiring that Defendant Commissioner Sewell's punishment of Plaintiff be consistent with the record.

69.    Plaintiff was terminated by the NYC Defendants based on the authority vested by Section 14-115 of the NYC Admin Code which prescribes that police officers, shall be dismissed from the NYPD only on written charges made, after such charges have been examined, heard and investigated by the commissioner or one of his or her deputies in such

manner or procedure, practice, examination and investigation as the police commissioner may, by rules and regulations, from time to time prescribe.

70.    The NYC Defendants set forth certain rules and regulations in the NYPD's Disciplinary Guidelines, which included that Plaintiff had the legal right to a full de novo administrative hearing, at which the Department has the burden of proving the Charges by a preponderance of the evidence.

71.    Defendant Commissioner Sewell delegated the investigatory requirements imposed by Section 14-115(b) to ADC Kleiman to be performed under a department trial, which, in addition to the rules prescribed by Defendant Commissioner Sewell, is subject to 38 RCNY § 15-08.

72.    Unfortunately, in violation of 38 RCNY § 15-08(a), the Police Commissioner disapproved Kleiman's Report, modifying his findings and the penalty in a manner NOT consistent with the record.[9] As ADC Kleiman clearly articulated in the Kleiman Report, "having reviewed all of the evidence in this matter, I find that the record failed to establish by a preponderance of the evidence that [Plaintiff] wrongfully possessed or ingested cocaine" (emphasis added).

73.    Additionally, Defendant Commissioner Sewell's contention in the Sewell Memorandum that the penalty of dismissal was made in accordance with the NYPD's Disciplinary Guidelines is unsupported when examined against the express language of the NYPD's Disciplinary Guidelines as excerpted below (emphasis added).

> Both the public and police officers must understand and, indeed expect, that when the bounds of the law or Department policy are exceeded, equitable discipline will result. Similarly, ***it should be expected that any discipline imposed will be fair,***

---

[9] *See* 38 RCNY § 15-08(a) (prescribing that the police commissioner "may approve the recommendation or modify the findings or the penalty [of a deputy commissioner] ***consistent with the record***") (emphasis added).

***consistent, and based upon reasonable standards***. Fairness within a disciplinary system begins with taking the time to objectively review the totality of the circumstances surrounding any substantiated misconduct. ***Proportionality of discipline requires that each instance of misconduct is addressed in line with the seriousness of that misconduct, including any aggravating and mitigating circumstances***. The [presumptive penalty] may vary and are based upon a consideration of numerous factors including, but not limited to, the nature and seriousness of the misconduct, the circumstances under which the misconduct was committed, the harm or prejudice arising from the misconduct, and the existence of any relevant mitigating or aggravating circumstances.

74. The NYPD's Disciplinary Guidelines note, "[T]he Office of the Deputy Commissioner of Trials conducts Department trials in a fair and impartial manner, consistent with the rules and regulations governing administrative hearings, as well as the due process rights of the Department's members."

75. Regardless of several mitigating factors the "Presumptive Penalty" of termination was imposed. The Sewell Memorandum fails to address even one of the numerous mitigating factors present in the record, including (i) that Plaintiff knowingly and voluntarily submitted to a non-random drug test, (ii) the Independent Negative Tests performed by both Psychemedics and other third-party laboratories, (iii) the Department's own expert witness testimony that the evidence taken as a whole did not point to, if at all, the potential to repeat or habitual use; or (iv) Plaintiff's long standing and exemplary career spanning an 17-year period.

**Improper Burden Shifting**

76. Even more problematic, Defendant Commissioner Sewell erroneously indicated that "ADC Kleiman and [Plaintiff's] own expert witness found [Plaintiff's] explanation for the presence of cocaine in this samples to be improbable" thereby improperly shifting the burden of proof to Plaintiff in violation of the NYPD's Disciplinary Guidelines. The Kleiman Report

was clear, Plaintiff provided a "best guess as to how his hair samples might have been contaminated," given his exposure to an overdose-related arrest where both Plaintiff and other members of the NYPD testified seeing a "white powdery substance" only a couple of days prior to the April 19, 2021, NYPD Drug Test. The Kleiman Report clearly articulates that "the burden rests with the Department to prove by a preponderance of the evidence that [Plaintiff] wrongfully ingested cocaine, which in this case required the Department to show that the scientific test it has relied on to establish ingestion is capable of distinguishing between ingestion and any reasonable contamination scenario. The Department failed to do so in this case."

**Misrepresentation of Drug Test Results as a Basis for Dismissal**

77.    In the Sewell Memorandum, Defendant Commissioner Sewell erroneously contends that all of the samples tested by Psychemedics and third-party laboratories chosen by Plaintiff scientifically determined the presence of cocaine in his system. (In finding Plaintiff guilty of the Charges at issue, the Commissioner noted that "[t]he Department has routinely relied on the results of the testing procedures employed here, and [the Commissioner] find[s] no reason to disturb the result of the drug test in [Plaintiff's] matter" and "in this matter, all the samples tested by the Psychemedics Corporation, as well as the laboratory chosen by [Plaintiff], were scientifically determined to be positive for the presence of cocaine"). ***This assertion of fact by Defendant Commissioner Sewell is patently false.*** As explicitly stated in the Kleiman Report, "[Plaintiff's] head hair sample, tested by [Psychemedics], was negative for cocaine."

78.    Plaintiff also had numerous other samples tested by either Psychemedics or third-party laboratories that scientifically determined that cocaine was ***NOT*** present in his system during the time in question. Accordingly, this misrepresentation casts extreme doubt

regarding the veracity of Defendant Commissioner Sewell's claim that she "considered the totality of the circumstances" and "reviewed all the evidence presented at trial." If she had, she would know that only the defective Defendant Psychemedics testing yielded a false positive for cocaine, while every other test—including those conducted by independent laboratories—proved the absence of any illicit substances.

79.    Additionally, this misrepresentation significantly harmed the Plaintiff's right to due process because it produced an inaccurate official record that the reviewing court, potential employers, or the public might rely on incorrectly, even though the statement was completely inconsistent with the actual trial evidence reviewed by Defendant Commissioner Sewell when making the termination decision.

**Discrepancies and Willful Misinterpretations of Laboratory Results**

80.    At the Departmental trial, it was undisputed that Plaintiff's A-sample and B-sample were collected from the calf area of his left leg, while the C-sample was collected from the shin of the same leg—all during the same collection period. Laboratory analysis by Psychemedics Corporation of the A- and B-samples found 5.95 nanograms (ng) and 6.54 ng of cocaine (COC) per 10mg of hair, respectively—both just marginally above the laboratory's self-imposed 5 ng/10mg "cut-off" (Tr. 62, 68), a threshold the Department claims "eliminates" false positives but which is nowhere mandated by statute or regulation. Despite these borderline results, the NYPD repeatedly asserted in disciplinary memoranda and the Commissioner's Report that a "failed" drug test is incontrovertible proof of ingestion, disregarding the scientific ambiguity of the data and Plaintiff's own negative results in subsequent verified testing.

81.    The result from Plaintiff's C-sample, analyzed by Quest Diagnostics ("Quest"), presents a stark and troubling anomaly: Quest Diagnostics reported a value of 22.55 ng

COC/10mg—nearly 3.6 times higher than the results found by Psychemedics. Rather than investigating this striking divergence, the NYPD Commissioner in the Sewell Memorandum erroneously cited the Quest Diagnostics C-sample as confirmatory "proof" of drug use—a position directly contradicted by the protracted, well-documented expert testimony on this very issue at trial. Defendant Paulsen, Psychemedics' own scientist, testified under oath that such a large variance is "very unusual," especially given the proximity between the A and B results. Defendant Paulsen admitted he had no firsthand knowledge of Quest Diagnostics' washing protocols and could only speculate that "perhaps less extensive washing" at Quest Diagnostics accounted for the higher result—an explanation he repeatedly qualified as his "best guess" and one which he expressly stated was not grounded in personal knowledge of Quest Diagnostics techniques.

82.     Additionally, upon information and belief, Defendant Paulsen had a vested interest in making claims that Quest Diagnostics less robust methods were the most likely result for the unusual disparity in Plaintiff's Samples. In fact, in its SEC Filings, it states that "[Defendant Psychemedics] competes directly with numerous commercial laboratories that test for drugs primarily through urinalysis testing. Most of these laboratories, such as Quest Diagnostics, have substantially greater financial resources, market identity, drug testing market share, marketing organizations, facilities, and more personnel than [Defendant Psychemedics]"[10] Yet, despite the public admission that Quest Diagnostics is one of Defendant Psychemedics direct competitors with substantially greater financial resources, the Defendants have adopted the position, without independent verification, that less robust washing techniques

---

[10] See Psychemedics Corp., Annual Report (Form 10-K) (Mar. 26, 2023), at 4, available online at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.sec.gov/Archives/edgar/data/806517/000117184323004596/ars_072123.pdf)

caused the sample disparity.

83.     Notwithstanding the above, the NYC Defendants relied on such testimony as explicitly stated by Commissioner Sewell in the Sewell Memorandum: "as testified to by [Defendant Paulsen], the disparity in the testing results could be expected due to the even stricter procedures used by the Psychemedics Corporation [as opposed to Quest Diagnostics] in eliminating the possibility of any external contamination". This joint action amongst the Defendants was the direct and proximate cause of Plaintiff's termination, depriving him of a protected property interest in his tenured public employment without due process of law.

84.     Expert witnesses called by Plaintiff, Drs. Kidwell and Lykissa, were likewise unable to reconcile the wide variance on the basis of decontamination protocol alone. Both experts acknowledged that laboratories may use different wash techniques, but ultimately opined that the substantial discrepancy between samples, combined with the fact that the C-sample was collected from a distinct portion of the leg, strongly suggests an episode of external contamination rather than ingestion.

85.     The testimony was further supported by uncontradicted evidence that no prior NYPD disciplinary case had ever featured a disparity of this magnitude between split laboratory results, and, as Administrative Deputy Commissioner (ADC) Kleiman emphasized in the Department's own report, Quest Diagnostic's results in comparable cases were often equal to or lower than those produced by Psychemedics.

86.     Nevertheless, the NYPD Commissioner denied the significance of these facts in the final decision, repeatedly referencing—as if dispositive—the "right" of a member to request independent testing, while simply ignoring both ADC Kleiman's analysis and Plaintiff's credible testimony, which had been deemed fully credible by the hearing adjudicator.

87.    In sum, all competent scientific and factual evidence—extensive trial testimony, credible expert opinion, and the NYPD's own disciplinary history—strongly supports that the highly unusual discrepancy in Plaintiff's laboratory results was "more likely than not" caused by external contamination, not ingestion. Defendant Commissioner Sewell's willful disregard of these facts, and continued reliance on a scientifically unsound, arbitrary, and capricious application of laboratory thresholds, violates both basic principles of fairness and the fundamental requirements of due process.

**Systemic Bias and Predetermined Outcomes**

88.    Upon information and belief—other than Plaintiff— no NYPD police officer who has been charged with the wrongful possession and use of cocaine has ever been found Not Guilty following a department trial. Nor has any NYPD police commissioner ever overturned a deputy commissioner's finding of Not Guilty with respect to the wrongful use or possession of illicit drugs. This unbroken record demonstrates that, irrespective of compelling mitigating evidence or unique circumstances, the NYC Defendants' practice effectively renders termination the sole outcome for any positive drug result involving cocaine.

89.    Accordingly, despite the façade of a department trial, Defendant Commissioner Sewell's unfettered ability to overturn well-reasoned findings by ADC Kleinman, including with respect to Plaintiff's credibility, and shift the burden of proof to Plaintiff in violation of the NYPD Disciplinary Guidelines, is arbitrary and capricious. It leaves no room for the possibility of a false positive—a possibility that even Defendant Paulsen admitted exists.

90.    The rejection of the Department's own impartial fact-finding was not a good-faith disagreement, but an arbitrary and capricious disregard for the record evidence, process, and scientific expertise—undermining the very integrity of the agency's adjudicative system.

91.     Defendant Commissioner Sewell's decision to cast aside well-founded factual and scientific conclusions, misconstrue the trial record, and improperly equate ambiguous or "unusual" test results with evidence of drug use is a patent violation of Plaintiff's due process rights by unjustly depriving him of his protected property interest. Further, Psychemedic Defendants' negligent endorsement of hair testing methods as infallible deprived Plaintiff of a fair assessment and was a direct and proximate cause of his termination.

**f.    The Consequences of Trumpeting Scientific Infallibility: Systematic and Unchecked Deprivation of Civil Servants' Rights**

92.     For nearly two decades, the NYC Defendants have relied exclusively on Defendant Psychemedics for all hair-based drug screening of officers in disciplinary contexts. Upon information and belief, under the parties' longstanding commercial arrangement, Defendant Psychemedics serves as the Department's forensic agent—not merely a third-party vendor—handling every phase of drug testing and reporting at Defendant NYPD's direction.

93.     Upon information and belief, Defendant Psychemedics personnel, including Defendant Paulsen, worked in direct and continued collaboration with Defendant NYPD officials throughout all stages of the drug testing program—not with the primary goal of determining actual cocaine use, but to produce and frame test results in such a manner as to guarantee police officer terminations.

94.     Since the NYC Defendants charge police officers with "wrongful" use or possession, positive tests resulting from external contamination would undermine the Departments' unfettered power to terminate police officers without due process.

95.     Defendant Paulsen has a monetary interest in Psychemedics and has financial incentives to perpetuate this uncertainty, even considering the serious consequences faced by

members of the NYPD who are falsely accused, like Plaintiff.

96.    Plaintiff asserts that Defendant Paulsen knows or should know that Defendant Psychemedics is unable to conclusively demonstrate that its testing process on hair samples can accurately and reliably determine whether drugs that were present in hair samples entered the hair from drug use or from external contamination. Rather than acknowledge this fact and use his scientific resources to provide alternative testing techniques that are scientifically reliable to test for drug use, Defendant Paulsen has acted to justify and bolster Defendant Psychemedics' position that hair testing is a reliable method for determining drug use.

97.    Despite holding a laboratory license from the New York State Department of Health, Psychemedics' licensure only indicates compliance with laboratory operations and does not serve as scientific endorsement of its process; the Department of Health does not comment on the laboratory's ability to differentiate between drug ingestion and external environmental contamination. The NYC Defendants, however, have for years prevented any cross-comparison or confirmatory analytical method, relying solely on Psychemedics' representations for disciplinary outcomes with career-ending consequences.

98.    Defendant Commissioner Sewell's decision to terminate Plaintiff's employment with the NYPD was based solely on the failed April 19 Department Drug Test.

99.    At the Department Trial, it was established by the testimony of both parties' experts, including Defendant Paulsen, that Defendant Psychemedics' hair testing cannot reliably discern between cocaine ingestion and exposure to a contaminated environment—a core flaw given that police officers, including Plaintiff, encounter drugs and contaminated objects as part of their routine duties. As supported by the Department Trial record, the Defendants' have relied solely on Defendant Psychemedics hair testing results for proving

ingestion rather than external contamination despite findings by scientific researchers and other courts casting doubts on the reliability of Defendant Psychemedics' testing of hair samples.[11]

100.    Despite this, the NYC Defendants continue to accept these flawed results as dispositive, while the Psychemedic Defendants knowingly promote—both to the NYPD and the public—the ability to distinguish ingestion from contamination. This critical deficiency undermines the credibility and accuracy of their testing process and has systematically cost hundreds of hard-working and innocent Police officers their employment.

101.    For example, Defendant Psychemedics, in public filings with the Securities and Exchange Commission ("SEC Filings")[12] and, upon information and belief, documents disseminated to investors and the marketplace, claims that its proprietary decontamination wash protocol, as analyzed in a 2014 FBI study, "will exclude false positive results from environmental contact with cocaine." Psychemedics affirmatively touts this purported scientific certainty as a principal justification for the NYC Defendants' continued exclusive reliance on its testing to make adverse employment decisions affecting Plaintiff and hundreds of other officers. According to its SEC filings, "the FBI concluded that the use of an extended wash protocol of the type used by the Company will exclude false positive results from environmental contact with cocaine," thereby promising NYPD and police officers that any positive finding is proof of ingestion and not contamination.

102.    Yet, at the Department Trial, Defendant Paulsen—the NYC Defendants' own expert and representative of Psychemedics—conceded that Plaintiff's test result was positive for only a single cocaine metabolite, BE, and further acknowledged that BE is not determinative

---

[11] See *Bos Police Dep't v Civil Serv. Comm'n*, 483 Mass. 461, 466-468 (2019).
[12] *See, e.g.*, Psychemedics Corp., Annual Report (Form 10-K) (Mar. 26, 2023), at 5–6, available online at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.sec.gov/Archives/edgar/data/806517/000117184323004596/ars_072123.pdf.

of ingestion and may, per the consensus of both parties' experts, be formed outside the body or result from cocaine contamination of hair, including after environmental exposure or in a laboratory setting. The very same 2014 FBI Study that Psychemedics trumpets in its SEC filings likewise concludes that "there appears to be little utility in measuring BE or BE/COC ratios in hair" for distinguishing ingestion from contamination, given the prevalence of false positives due to environmental factors. In this case, since BE was the only metabolite above any cutoff threshold, and it is undisputed by all testifying experts and the FBI that BE alone cannot prove ingestion, Plaintiff's resulting "positive" was, as a matter of science and objective fact, far more likely a false positive resulting from external contamination.

103.    Thus, there is a direct and material contradiction between the infallible narrative the Psychemedic Defendants' advance to the public and regulators, and the nuanced, scientifically cautious admissions made under oath in police discipline proceedings, where the Psychemedic Defendants' own methodology, and the NYC Defendants' reliance thereon, are at issue. The result is a systematic and unjust deprivation of protected property interests of police officers, including the Plaintiff.

### g.  Defendants' Systemic Reliance on Flawed Psychemedics Hair Testing

104.    Reliable adjudication of alleged drug use by law enforcement officers requires forensic methodologies capable of accurately distinguishing between intentional ingestion and unintentional exposure. However, there is a strong and ever-growing consensus among peer-reviewed scientific studies, government agencies, and independent experts that hair analysis—particularly as implemented by Defendant Psychemedics—cannot reliably make this distinction. Both existing research and published government findings demonstrate that hair testing is susceptible to false positives caused by environmental contamination, a risk only

magnified in police work. Despite these limitations, Defendants have ignored the weight of scientific authority and continued to represent hair testing as capable of definitively determining drug use, leading to arbitrary and unsupported disciplinary consequences for Plaintiff and similarly situated NYPD officers.

105.     In or around 1996, Defendant NYPD first started using hair analysis in conjunction with the more reliable urinalysis for drug testing of its employees. However, now, and since in or around 2005, the Defendant NYPD uses only hair analysis to perform all drug testing of its employees, meaning the results of the hair testing are no longer confirmed or cross-analyzed with urinalysis or any other method of drug testing. This change was made in an effort to **spend less** on drug testing and to make drug testing easier to complete in conjunction with the Department's "zero tolerance" policy of drug use. Ironically, while these changes may have saved Defendant NYPD money, they have also made its testing results unreliable for distinguishing between ingestion and external contamination.

106.     Since Defendant NYPD began using hair testing, this question regarding the reliability of the testing process has been well-documented. For example, when Defendant NYPD began its hair-testing program, the fraternal organization 100 Blacks in Law Enforcement Who Care issued a notice to Defendant NYPD regarding its concerns with the hair-testing process, citing a 1996 letter from the U.S. Health and Human Services Department, which identified the potential for racial bias and hair color bias to return false positive results at a disparate rate for people of color and women.

107.     These concerns further highlighted the unique nature of police work that requires police officers to come into frequent contact with and exposure to drugs of abuse through their daily duties. This reality thereby puts police officers at a heightened risk of a false positive hair

test due to external contamination or environmental exposure.

108.    Psychemedics was equally on notice with advances in the scientific community and governmental agencies, making clear the limitations in hair testing, including numerous peer-reviewed publications and reports in the scientific community.[13]

109.    This reality formed the basis of other Courts' findings that "Psychemedics drug testing procedure…was not sufficiently reliable alone to provide just cause for terminating a[n]… employee" because of "the concerns raised in the scientific community regarding the reliability of the tests," *Matter of Boston Police Dep't Drug Testing Appeals*, 26 Mass. Civ. Serv. Rep. 73 (2013), and because "[t]he ways in which substances, including controlled substances, can incorporate into the hair follicle vary and are not fully understood," ultimately concluding that the "…external contaminants may become absorbed into the hair and, once absorbed, are resistant to removal." *Boston Police Department v. Civil Service Commission*, et al, 483 Mass. 461, 133 N.E.3d 322 (2019).

110.    The Court also discussed the Matter of *Boston Police Dep't Drug Testing Appeals*, 26 Mass. Civ. Serv. Rep. 73 (2013), "a lengthy decision that included a comprehensive discussion of [Defendant] Psychemedics' drug testing procedure, [in which] the [Civil Service] commission determined that the [hair] test was not sufficiently reliable alone to provide just cause for terminating a tenured department employee" and "the concerns raised in the scientific community regarding the reliability of the test and the effectiveness of the washing procedure to remove external contaminants, and the questions about the ways in which controlled

---

[13] Such as Stout, Ropero-Miller, Baylor, & Mitchell, External Contamination of Hair with Cocaine: Evaluation of External Cocaine Contamination and Development of Performance-Testing Materials, 30 J. Analytical Toxicology 490, 490 (2006); Ropero-Miller & Stout, Analysis of Cocaine Analytes in Human Hair II: Evaluation of Different Hair Color and Ethnicity Types, Report to United States Department of Justice, Document No. 234628 (Mar. 31, 2010); D.A. Kidwell, E.H. Lee, and S.F. DeLauder, Evidence for bias in hair testing and procedures to correct bias, Forensic Science International 107 93-104 (2000); and S.F. DeLauder and D.A. Kidwell, The incorporation of dyes into hair as a model for drug binding, Forensic Science International 107 39-61 (2000).

substances can incorporate into a hair follicle." *Id.*

111.    Furthermore, Federal Agencies are barred from using hair drug testing as the sole basis to make employment terminations, according to official federal guidelines[14] and recent regulatory updates. The U.S. Department of Health and Human Services (HHS) has published proposed guidelines allowing hair drug testing in some federal employment contexts, typically as an alternative specimen, but requiring that a second specimen—usually urine or oral fluid—corroborate any positive hair test before a termination decision can be taken.

112.    Moreover, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), an agency within the Department of Health and Human Services, has found that it is impossible to remove all external contaminants from hair and therefore contamination of hair cannot be distinguished from drug use[15,] specifically noting that there is no industry standard with respect to "decontamination procedures" (i.e.: wash criteria).

113.    Additionally, studies have shown that hair testing is an unreliable method to distinguish between ingestion of cocaine and contamination from environmental exposure. For example, in a study published in Forensic Science International in 1996, researchers found that cocaine and related compounds were deposited in the hair of children living in environments where cocaine use occurred. Remarkably, in some cases, the concentration of cocaine in the children's hair was higher than in the hair of adult cocaine users, despite no evidence of the children ingesting cocaine.

114.    The study further demonstrated that passive exposure to cocaine in the

---

[14] In 2020 SAMHSA, authored proposed guidelines ("2020 SAMHSA Guidelines") for federal workplace drug testing, which were published in full in the Federal Register. *See*, Mandatory Guidelines for Federal Workplace Drug Testing Programs, *available online at* https://www.govinfo.gov/content/pkg/FR-2020-09-10/pdf/2020-16432.pdf (last visited October 31, 2025).
[15] S*ee, e.g.*, The Science of Hair Testing, SAMHSA's Division of Workplace Programs, *available online at* https://www.samhsa.gov/sites/default/files/meeting/ documents/makela-literature-summary-dtab-june-2014.pdf (last visited October 30, 2025).

environment could lead to positive hair test results. Skin swabs confirmed that external contamination, rather than ingestion, was the likely source of the cocaine found in hair samples. Additionally, urine tests of the children in the study were negative for cocaine metabolites, a result inconsistent with ingestion but consistent with environmental exposure. The researchers concluded that hair testing alone cannot reliably differentiate between active ingestion of cocaine and contamination from environmental contact, rendering it an unreliable method of determining actual drug use. These findings underscore the risk of false positives and the potential for significant misinterpretation in cases relying solely on hair testing to establish cocaine use.

115.    Despite knowing the scientific shortcomings of hair testing, Defendants continue to use and promote it as dispositive proof of drug use and a basis for termination. Working in concert, the Psychemedics Defendants and NYC Defendants perpetuate the false narrative that this method is infallible, despite Psychemedics' inability to rule out environmental contamination as the source of positive results. Nevertheless, Psychemedics repeatedly claims that its wash procedures eliminate all false positives, a claim that lacks scientific support. [16]

116.    Furthermore, these claims have been independently confirmed as incorrect through a recent, rigorous, blinded, peer-reviewed government-funded study conducted by RTI International (the "RTI Study"). This study presents strong scientific evidence that hair drug testing for cocaine, as performed by leading commercial laboratories, is methodologically unreliable and cannot consistently differentiate between drug ingestion and external

---

[16] *See* Psychemedics Corporation. Debunking Myths: Common Misconceptions About Hair Drug Testing. November 2024, available online at https://www.psychemedics.com/wp-content/uploads/2024/11/WhitePaper-Debunking-Myths-1.pdf. (last visited October 31, 2025)

contamination.[17]

117.    The RTI Study demonstrates that even when employing industry-standard, aggressive washing and analytical techniques, (a) all laboratories produced false positive findings for cocaine when presented with externally contaminated hair; (b) key metabolites often cited as markers of ingestion, including BE, norcocaine, and hydroxycocaine, were also detected in these contaminated samples, and (c) laboratory protocols—particularly regarding cutoffs and wash procedures—resulted in as much as a five-fold variation in results between labs, and inconsistent positive/negative determinations for identical samples.

118.    Crucially, the RTI Study found that no decontamination or analytical methodology currently in wide use could eliminate the risk of false positives caused by environmental exposure, particularly in real-world settings involving regular contact with cocaine in the line of duty, as is the case for law enforcement officers. The supposed differentiators—special metabolite ratios, such as meta- or para-hydroxycocaine to cocaine—remained present in both user and contaminated hair, varying by context and failing to provide a scientifically reliable separation between use and exposure. The RTI Study's findings directly undermine Defendants' reliance on hydroxycocaine and related metabolite analysis to support disciplinary action against Plaintiff, given the strong evidence that such results are prone to misinterpretation.

119.    In fact, it is widely believed that Defendant Psychemedics was one of the five commercial laboratories that participated in and failed the RTI Study.

120.    Accordingly, the RTI Study confirms that Plaintiff's positive result could

---

[17] *See* Hart, E. D. et al., "Performance of Hair Testing for Cocaine Use: Comparison of Five Laboratories Using Blind Reference Specimens," RTI International (October 2022), available online at https://academic.oup.com/jat/article/47/2/154/6678859?login=false (last visited October 31, 2025).

reasonably have arisen from environmental or occupational contamination, despite Defendants' assertions to the contrary. In light of these findings, the continued reliance on hair testing to discipline and terminate Plaintiff constitutes professional negligence and a violation of due process. The RTI Study's conclusions, together with the robust Department Trial record, substantially support Plaintiff's contention that his positive hair test result for cocaine was more likely the product of external contamination than voluntary ingestion.

121.    Despite the fact that the Defendants knew or should have known of these concerns and determinations, the NYC Defendants have failed to adjust or modify their drug testing policies or procedures for members of the NYPD, and the Psychemedic Defendants continue to provide unreliable drug testing.

122.    Upon information and belief, the Defendant Commissioner Sewell's determination of Plaintiff's guilt was based on protecting the reliability of the NYC Defendants' testing procedures rather than whether or not Plaintiff actually ingested or possessed cocaine as charged.

123.    If the Police Commissioner had agreed with ADC Kleiman's reasoning, it might have called into question the longstanding testing procedures used to dismiss police officers—potentially creating substantial litigation and monetary risks for Defendants. Defendant NYPD is free to choose its testing laboratory of choice, but the law does not shield it from making decisions lacking a sound basis in reason and fact, especially when such decisions serve to safeguard the Defendants' financial interests rather than the interests of the City of New Yorks public servants.

124.    By and through the acts and/or omissions of Defendants complained of herein, Plaintiff has suffered and will continue to suffer permanent damage to his career including, but

not limited to, lost wages and other benefits and privileges of employment, damage to his reputation and earnings potential as well as current and future employment opportunities.

125.    By and through the acts and/or omissions of Defendants complained of herein, Plaintiff has suffered and will continue to suffer emotional distress and mental anguish as a result of Defendants' unlawful conduct.

126.    By and through the acts and/or omissions of Defendants complained of herein, Plaintiff has suffered and will continue to suffer from violations of his Constitutionally-protected property rights.

## COUNT I-PROCEDURAL DUE PROCESS (UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983) (AGAINST THE NYPD, THE CITY OF NEW YORK, AND COMMISSIONER SEWELL IN HER OFFICIAL CAPACITY AS POLICER COMMISSIONER OF THE NYPD FOR DAMAGES UNDER MONELL)

127.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

128.    The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." The due process clause of the Fifth Amendment imposes a parallel obligation on federal officials and those acting under color of federal law.

129.    Officer Santos's competitive civil service position as an NYPD officer, which could be terminated only "for cause" under New York law, constituted a property interest protected by the Due Process Clause.

130.    Additionally, Plaintiff had a protected **property interest** in his continued public employment as a tenured NYPD officer pursuant to New York Civil Service Law § 75, as well

as a corresponding entitlement to discipline only **in accordance with governing rules and a fair, record-based process**.

131.    The Due Process Clause requires that before the government may deprive an individual of a protected property or liberty interest, it must provide notice and a meaningful opportunity to be heard at a meaningful time and in a meaningful manner.

132.    Due process requires that the decision maker be impartial and that the decision be based on the evidence presented at the hearing. A decision that is arbitrary, capricious, unsupported by substantive evidence, or based on improper procedure violates due process.

133.    Despite a six-day department trial in which ADC Kleiman issued a report concluding that Plaintiff was not guilty because Defendant NYPD failed to prove cocaine ingestion rather than environmental contamination, the Plaintiff was still terminated on November 3, 2022, when Defendant Commissioner Sewell, **without conducting any independent evidentiary hearing, taking additional testimony, or providing Plaintiff with an additional opportunity to be heard, took the extraordinary and unprecedented action of overriding ADC Kleiman's decision**, thereby depriving the plaintiff of his property interest.

134.    The Commissioner's reversal of the not guilty findings deprived Officer Santos of due process in multiple respects, including, but not limited to:

135.    The decision was arbitrary and capricious because it failed to identify any errors of law or fact, failed to provide any reason or explanation for disregarding the extensive evidence supporting acquittal, and failed to articulate any legal or factual basis for her contrary conclusion.

136.    Defendant Commissioner Sewell ignored critical evidence, including eight Independent Negative Drug Tests that established a scientifically proven timeline that made

ingestion impossible, and a significant 3.6-fold laboratory disparity, scientific consensus that BE cannot distinguish ingestion from contamination, and officer Santos's 17 years of unblemished record.

137.    Defendant Commissioner Sewell' decision was inconsistent with the record, as required by 38 RCNY § 15-08 (a). The record established that the department failed to meet its burden of proof, a factual finding that cannot be overturned without a reasoned explanation based on evidence.

138.    Defendant Commissioner Sewell, as the head of the agency that initiated disciplinary proceedings against Plaintiff, had an institutional interest in sustaining the charges by overruling the ADC's not guilty verdict. She acted as prosecutor, judge, and jury, a structural bias that violated Plaintiff's right to due process.

139.    Plaintiff was denied an opportunity to directly respond to Defendant Commissioner Sewell's reversal of the ADC's findings and was not afforded an opportunity to present arguments or evidence in defense of the reversal.

140.    The process was further rendered fundamentally unfair because, during Defendant NYPD's rebuttal, hydroxycocaine testing was initiated before consent was obtained and conducted without an available confirmatory A-sample after Defendant Psychemedics spilled that sample—depriving Plaintiff of proper protocols.

141.    The procedural defects described were not random or unauthorized acts by low-level employees; they were the final decision of Defendant Commissioner Sewell, which ignored the trial record and ADC Kleiman's findings, rendering Plaintiff's "trial" before ADC Kleiman a meaningless charade.

142.    The City of New York is liable under Monell because the constitutional

deprivation was caused by (a) the final decision of Defendant Commissioner Sewell, and/or (b) the NYC Defendant's policy, practice, and custom of (i) exclusive reliance on Defendant Psychemedics hair-testing to prove ingestion, (ii) discounting or disregarding exculpatory scientific evidence and negative results, and (iii) overturning trial-level exonerations in a manner inconsistent with the record.

143.    As a direct and proximate result of the foregoing deprivations of procedural due process, Plaintiff suffered and continues to suffer economic loss (including lost salary, benefits, and pensionable service), reputational harm, and emotional distress, and faces impaired future employment opportunities.

### COUNT II-SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983)<br>(AGAINST THE NYPD, THE CITY OF NEW YORK, AND<br>COMMISSIONER SEWELL IN HER OFFICIAL CAPACITY<br>AS POLICER COMMISSIONER OF THE NYPD FOR<br>DAMAGES UNDER MONELL)

144.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

145.    The Due Process Clause protects individuals not only from unjust procedures, but also from arbitrary and oppressive government action that "shocks the conscience" or violates fundamental principles of justice.

146.    Defendant Commissioner Sewell's reversal of a not guilty verdict rendered after a comprehensive six-day trial, without any articulated legal or factual justification and in defiance of overwhelming exculpatory evidence, constitutes arbitrary and oppressive government action that shocks the conscience.

147.    Plaintiff was subjected to a disciplinary system in which the very entity that brought charges against him (the NYPD) retained unfettered discretion to overturn a partial

factfinder's determination of innocence. This system denies fundamental fairness and creates an inherent structural bias against the accused officer.

148.    The substantive due process violations are particularly egregious because (a) ADC Kleinman issued a detailed reasoned opinion finding Department NYPD failed to meet its burden of proof, (b) Defendant Commissioner Sewell provided no legitimate explanation for why that determination was erroneous other than the failed Department drug test, (c) the evidence overwhelmingly supported the not guilty finding, (d) Defendant Commissioner Sewell ignored the evidence that overwhelmingly supported the not guilty finding, and (e) Defendant Commissioner Sewell's reversal effectively nullified Plaintiff's right to a fair hearing.

149.    The City of New York is liable under Monell because the substantive-due-process deprivation was caused by: (a) Defendant Commissioner Sewell's final decision, which constitutes the NYC Defendants' policy; and/or (b) the NYC Defendants' policy, practice, or custom of (i) exclusive or undue reliance on Defendant Psychemedics hair-testing to prove ingestion, (ii) discounting or disregarding exculpatory scientific evidence and negative results, and (iii) overturning trial-level exonerations in a manner inconsistent with the record—each of which was the driving force behind Plaintiff's termination.

150.    Defendants' actions were motivated by institutional interests rather than any legitimate governmental purpose, and they violated Plaintiff's substantive due process rights under the 5th and 14th Amendments.

151.    As a direct and proximate result, Plaintiff suffered lost wages and benefits, loss of pensionable service, reputational harm, emotional distress, and diminished future employment opportunities.

## COUNT III- DEPRIVATION OF LIBERTY INTEREST WITHOUT DUE PROCESS

**(42 U.S.C. §1983)**
**(AGAINST ALL DEFENDANTS)**

152.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

153.    The Fourteenth Amendment protects an individual's liberty interest in reputation where government action imposes a stigma that forecloses other employment opportunities.

154.    The Charges against Plaintiff—wrongful possession and use of cocaine—and Defendant Commissioner Sewell's finding of guilt despite ADC Kleiman's contrary determination imposed a permanent stigma on Plaintiff that will follow him throughout his professional life.

155.    Plaintiff's termination, coupled with the stigmatizing charges of drug possession and use, deprives him of future employment opportunities in law enforcement and related fields, thereby triggering the stigma-plus doctrine and his entitlement to due process protections.

156.    Before imposing such stigmatizing charges, the government was required to provide Plaintiff with notice and a meaningful opportunity to clear his name. While Plaintiff received an administrative hearing at which he successfully defended himself, Defendant Commissioner Sewell's reversal of that exoneration—without notice or opportunity to respond—violated his liberty interest.

157.    As a direct and proximate result of Defendants' deprivation of his liberty interest without due process, Plaintiff has suffered and continues to suffer irreparable harm to his reputation, foreclosure of employment opportunities and severe emotional distress.

**COUNT IV - CONSPIRACY TO DEPRIVE CIVIL RIGHTS**
**(42 U.S.C. §1983)**
**(AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)**

158.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

159.    At all relevant times, Defendant Psychemedics served as NYPD's exclusive forensic testing contractor/agent for hair testing in disciplinary matters, working in close coordination with Defendant NYPD's legal and disciplinary personnel concerning Plaintiff's samples, consent, cutoffs, sequencing of tests, and interpretation of results.

160.    The Psychemedic Defendants, together with NYPD officials, agreed and willfully participated in a common plan to employ irregular testing procedures and evidence-handling practices to generate or sustain an accusation of cocaine ingestion against Plaintiff and to terminate his employment without constitutionally adequate process.

161.    The agreement overt acts included, among other things: (a) initiating hydroxycocaine ("HC") testing before consent was obtained; (b) selecting or applying non-standard and interpretive criteria for HC and benzoylecgonine; (c) negligently or willfully spilling Plaintiff's A-sample and proceeding without an available confirmatory re-test; (d) withholding or misstating material facts about negative results and the scientific meaning of any positive findings; and (e) presenting those results to Defendant Commissioner Sewell in a manner designed to override ADC Kleiman's Not-Guilty finding.

162.    By virtue of Defendant Psychemedics' exclusive role in Defendant NYPD's disciplinary process and its joint participation with NYPD officials in the evidence-generation and decision-making chain, the Psychemedics Defendants acted under color of law through joint action/entwinement with the NYC Defendants.

163.    The concerted conduct described above deprived Plaintiff of rights secured by the Fourteenth Amendment.

164.    The conspiracy and the resulting deprivation were foreseeable and intended consequences of Defendants' coordinated plan to achieve a guilty result, no matter what.

165.    As a direct and proximate result of Defendants' conspiracy and joint action, Plaintiff sustained economic losses (including lost wages, benefits, and pension service), reputational injury, and emotional distress, and faces diminished future employment opportunities.

## COUNT V- FRAUD AND, IN THE ALTERNATIVE, CONSTRUCTIVE FRAUD (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)

166.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

167.    In the period preceding and during Plaintiff's Department Trial and Defendant Commissioner Sewell's review, the Psychemedics Defendants, acting as Defendant NYPD's exclusive forensic testing contractor and agent on Plaintiff's matter, made—and caused to be made to Plaintiff and to NYPD decision-makers—material representations and omissions, including, but not limited to: (a) that both A-sample and B-sample was available for testing; (b) that the HC methodology and the cutoff and interpretive standards employed were validated, standard, and reliable indicators of ingestion rather than environmental contamination; (c) that Plaintiff's samples and results were uniformly positive and that negative or inconsistent results were immaterial or not exculpatory; and (d) that a positive HC retest would only be used for purposes of exoneration, and not further proof of guilt given no scientific consensus regarding its reliability for proving use via ingestion.

168.    These statements and omissions were false and/or misleading when made because Defendant Psychemedics initiated HC testing before consent was obtained; the cutoffs

and interpretive criteria applied were non-standard and disputed in light of scientific literature and record evidence reflecting substantial uncertainty regarding ingestion versus contamination; Plaintiff's head-hair test was negative and multiple independent tests were negative—facts that were downplayed or misstated; and the A-sample was negligently or willfully spilled or otherwise destroyed, permanently eliminating the promised opportunity for independent confirmation.

169.   The Psychemedic Defendants acted with scienter and knew their statements were false, or recklessly disregarded their truth, to induce Plaintiff to acquiesce to additional HC testing, to forgo or delay obtaining independent confirmation, and to proceed through the disciplinary process under tainted and incomplete evidentiary conditions.

170.   Plaintiff reasonably and foreseeably relied on the Psychemedic Defendants' representations and omissions. In reliance, Plaintiff consented to HC testing on the assurance that consent would precede testing and that HC methodology and cutoffs were validated and reliably indicative of ingestion; that a confirmatory A-sample re-test would be available and credited; and he structured his litigation strategy in reliance on the promised availability of A-sample confirmation and the Psychemedics Defendants' assurances that negative results would be considered exculpatory if obtained.

171.   Psychemedics Defendants' misrepresentations and omissions proximately caused Plaintiff's injuries through a foreseeable lost-evidence causal chain: they induced Plaintiff to forgo contemporaneous exculpatory opportunities and to proceed under protocols that destroyed confirmatory evidence (the A-sample) thereby depriving him of exculpatory confirmation and materially impairing his defense at the Department Trial and on Defendant Commissioner Sewell's review, which impairment was relied upon by decision-makers and

culminated in his termination and related harms.

172.    As a direct and proximate result of the foregoing fraud, Plaintiff suffered termination of employment, lost wages and benefits, loss of pensionable service, reputational harm, emotional distress, diminished future employment opportunities, and other special and consequential damages to be proven at trial.

173.    In the alternative, to the extent a confidential or special relationship is found, the Psychemedic Defendants—acting as NYPD's exclusive forensic agent performing testing integral to adjudicating Plaintiff's employment and communicating directly to Plaintiff regarding consent, methodology, cutoffs, and confirmatory safeguards—stood in a relationship of trust and confidence toward Plaintiff, thereby giving rise to a duty to disclose complete and accurate material facts; their omissions and misleading half-truths constituted constructive fraud and caused the same damages set forth above.

## COUNT VI - NEGLIGENT MISREPRESENTATION (PLED IN THE ALTERNATIVE TO FRAUD) (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)

174.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

175.    At all relevant times, the Psychemedic Defendants acted as Defendant NYPD's exclusive forensic testing contractor/agent in Plaintiff's disciplinary matter, providing testing, analysis, and opinions for the specific, foreseeable purpose of informing adjudicative decisions that determined Plaintiff's continued employment.

176.    In that role, the Psychemedic Defendants were in a special relationship with Plaintiff because they knew their testing and representations would be used by Defendant NYPD decision-makers to adjudicate Plaintiff's rights, and they directly communicated about

testing, consent, and interpretive standards in a manner calculated to, and foreseeably resulting in, Plaintiff's reliance in managing his defense (including whether to consent to additional testing and how to respond to asserted results).

177.    In connection with Plaintiff's samples and the departmental proceedings, the Psychemedic Defendants supplied information to Plaintiff and Defendant NYPD decision-makers.

178.    Those statements were inaccurate and misleading, and the Psychemedic Defendants failed to use reasonable care in making them.

179.    The Psychemedic Defendants knew or should have known that Plaintiff would reasonably rely on their descriptions of consent, methodology, standards, and results for the specific purpose of guiding his defense and decisions in an adjudication determining his continued employment.

180.    Plaintiff reasonably relied on Defendants' negligent misrepresentations and omissions.

181.    The Psychemedic Defendants' negligence proximately caused Plaintiff's injuries through a foreseeable lost-evidence causal chain.

182.    Plaintiff seeks compensatory damages against the Psychemedic Defendants, together with costs and such other relief as the Court deems just and proper.

### COUNT VII - NEGLIGENCE (EVIDENCE HANDLING AND FORENSIC TESTING)
### (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN; AND AGAINST THE CITY OF NEW YORK FOR NEGLIGENT ADOPTION/SUPERVISION AND, ALTERNATIVELY, UNDER RESPONDEAT SUPERIOR)

183.    the Psychemedic Defendants undertook to collect, preserve, test, analyze, and report forensic toxicology evidence regarding Plaintiff's hair samples for use in Defendant

NYPD disciplinary proceedings, for the specific and foreseeable purpose of informing determinations about Plaintiff's continued employment.

184.    In doing so, they owed Plaintiff a duty to exercise reasonable care consistent with accepted forensic practices, including, but not limited to, maintaining chain of custody, preserving confirmatory samples, accurately describing methodology and limitations, obtaining and documenting consent in accordance with professional standards when seeking additional testing, and refraining from practices likely to yield unreliable or misleading results.

185.    The Psychemedic Defendants breached these duties by, among other things: (a) negligently or willfully spilling or otherwise destroying the retained A-sample necessary for independent confirmation; (b) initiating HC testing before consent had been obtained; (c) applying non-standard or disputed cutoffs and interpretive criteria for HC and benzoylecgonine and failing to disclose material limitations in their methodology; (d) misstating or downplaying Plaintiff's negative head-hair test and his multiple independent negative results; and (e) otherwise deviating from reasonable and accepted evidence-handling, testing, and reporting practices in a manner foreseeably producing an inaccurate and unfair disciplinary record.

186.    The City of New York, acting through NYPD personnel within the scope of their employment, was negligent in the ministerial handling and evaluation of evidence in Plaintiff's matter, including, but not limited to  by relying upon and transmitting irregular or incomplete laboratory results, failing to ensure preservation of confirmatory material, and permitting termination decisions to rest on non-standard testing and a record tainted by the loss of confirmatory evidence. To the extent the City of New York employees engaged in negligent evidence handling or negligent reliance/communication in the course of the disciplinary proceedings, the City of New York is liable under respondeat superior. In the alternative, the

City of New York is liable for negligent hiring, retention, and supervision as it knew or should have known of Defendant Psychemedics' deficiencies and complaints regarding its hair-testing methodology yet failed to take reasonable corrective or oversight measures.

187.    The foregoing breaches of duty were a direct and proximate cause of Plaintiff's injuries through a foreseeable lost-evidence and misinformation chain.

188.    Plaintiff suffered damages, including, but not limited to, termination of employment, lost wages, benefits, and pensionable service, reputational harm, emotional distress, and diminished future employment opportunities, together with other special and consequential damages to be proven at trial.

189.    The City of New York's acts and omissions challenged herein are ministerial operational failures in evidence handling and evaluation, not protected discretionary policymaking; in any event, they were undertaken without due care under circumstances requiring fair treatment of evidence in an adjudicative proceeding determining Plaintiff's employment.

## COUNT VIII - BREACH OF EMPLOYMENT AGREEMENT
## (AGAINST THE CITY OF NEW YORK AND THE NYPD)

190.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

191.    Plaintiff was employed by the City of New York and/or NYPD pursuant to a binding employment agreement governing his continued employment and discipline. That agreement consisted of and/or incorporated (a) a collective bargaining agreement and related memoranda, and (b) Defendant NYPD disciplinary rules and procedures that required any adverse action to be imposed only for "just cause" after fair, record-based procedures and adherence to established evidentiary and preservation safeguards.

192.    Plaintiff fully performed his obligations under the employment agreement and complied with applicable rules; he was not in material breach of any contractual duty.

193.    The City of New York and/or NYPD breached the employment agreement by terminating Plaintiff based on a defective and inaccurate testing process and a tainted evidentiary record, and not for "just cause."

194.    The City of New York and/or NYPD deprived Plaintiff of the contractual benefits of his employment, including continued service absent just cause supported by competent evidence.

195.    As a direct and proximate result of the City of New York and/or NYPD's breaches, Plaintiff suffered pecuniary losses, including termination of employment, lost wages and benefits, lost pensionable service and seniority credits, and other foreseeable consequential economic damages within the contemplation of the parties at the time of contracting.

## COUNT IX-BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)
### (AGAINST PSYCHEMEDICS CORPORATION)

196.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

197.    Defendant Psychemedics Corporation entered into a written agreement with the City of New York and/or NYPD to provide forensic toxicology services for use in NYPD disciplinary proceedings such as Plaintiff's.

198.    Upon information and belief, that agreement required Defendant Psychemedics to: (a) perform competently and in accordance with accepted professional standards and validated methods; (b) maintain chain of custody; (c) retain and preserve confirmatory material (including a retained "A-sample") for independent testing; (d) follow consent protocols before undertaking additional or specialized testing; and (e) provide complete and accurate reporting

that fairly described methodology, cutoffs/interpretive criteria, and material limitations so that disciplinary adjudications would be fair and reliable.

199.    Plaintiff was an intended third-party beneficiary of the Defendant Psychemedics agreement. The contract was made for the direct and particular benefit of the class of NYPD officers whose employment rights would be adjudicated based on the contracted testing and reports; the parties understood and intended that accurate, standards-compliant testing and transparent reporting would inure directly to such officers and determine their continued employment.

200.    Upon information and belief, the agreement contains no enforceable disclaimer negating third-party-beneficiary status for officers like Plaintiff, or any such clause is inapplicable to the duties invoked here.

201.    Defendant Psychemedics materially breached the agreement (and the implied covenant of good faith and fair dealing), including, but not limited to : (a) spilling/destroying the retained A-sample required for independent confirmation, defeating a preservation safeguard integral to the agreement's purpose; (b) initiating HC testing before obtaining consent as required by applicable consent protocols; (c) employing non-standard or disputed cutoffs and interpretive criteria for HC and benzoylecgonine without disclosing material limitations; (d) misstating or omitting material facts regarding Plaintiff's negative head-hair test and multiple independent negative results and the scientific meaning of any positive findings; and (e) otherwise failing to perform with the skill, care, and honesty required for forensic testing relied upon in employment-dispositive adjudications, including deviations from validation, preservation, and reporting requirements contemplated by the agreement.

202.    The foregoing breaches were a direct and proximate cause of Plaintiff's

pecuniary losses.

203.    Such losses were foreseeable and within the contemplation of the contracting parties at the time of contracting.

204.    Any conditions precedent to suit have occurred, been performed, or are excused. To the extent the agreement requires contractual or administrative presentment for claims, Plaintiff has satisfied such requirements, or such requirements are inapplicable to third-party-beneficiary enforcement of the duties alleged herein.

### COUNT X-BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (AGAINST CITY OF NEW YORK, THE NYPD AND IN THE ALTERNATIVE AGAINST PSYCHEMEDICS CORPORATION)

205.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

206.    Plaintiff was employed by the City of New York and/or NYPD pursuant to an employment relationship governed by New York Civil Service Law § 75 and related NYPD rules, policies, and disciplinary procedures, which together formed the contractual framework for his continued employment and discipline.

207.    New York law implies in every contract a covenant of good faith and fair dealing, prohibiting a party from acting dishonestly, opportunistically, or in a manner that deprives the other party of the contract's fruits.

208.    The fruits of Plaintiff's employment contract included a fair, reliable, and transparent disciplinary process in which the City of New York and/or NYPD would consider evidence in good faith, apply established rules even-handedly, and make record-based determinations consistent with governing standards.

209.    The City of New York and/or NYPD breached the implied covenant by

frustrating the contract's basic purpose and depriving Plaintiff of its benefits, including, but not limited to: (a) embracing and relying on knowingly irregular, inaccurate and undisclosed forensic practices; (b) accepting a tainted evidentiary record that omitted exculpatory results and the destruction of the confirmatory A-sample; (c) characterizing the results as uniformly positive while disregarding ADC Kleiman's Not-Guilty finding and negative/independent tests; and (d) reversing the trial result in a manner untethered to the record and contrary to rules requiring consideration of mandatory mitigating factors. These actions constituted bad-faith performance of the disciplinary process even if the City of New York and/or NYPD contends it technically complied with written procedures.

210.    As a direct and foreseeable result of the City of New York and/or NYPD's bad-faith performance, Plaintiff was deprived of a fair, record-based adjudication of his employment, culminating in termination and causing pecuniary loss, including lost wages and benefits and lost pensionable service, together with other consequential economic damages within the contemplation of the parties.

211.    Defendant Psychemedics entered into a written agreement with the City of New York and/or NYPD to provide forensic toxicology services for use in disciplinary matters such as Plaintiff's. Plaintiff is an intended third-party beneficiary of that agreement because the parties understood and intended that accurate, standards-compliant testing and transparent reporting would directly determine officers' employment status.

212.    Even if no express contractual term is ultimately found violated, Defendant Psychemedics breached the implied covenant by performing in bad faith and abusing any contractual discretion in ways that frustrated the agreement's purpose.

213.    Defendant    Psychemedics'    bad-faith    performance    proximately    caused

foreseeable pecuniary losses to Plaintiff.

## COUNT XI- TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)

214.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

215.    At all relevant times, Plaintiff was employed by the City of New York and/or NYPD pursuant to a binding employment contract and governing collective/disciplinary agreements, which required that any discipline or termination be imposed only after fair, record-based procedures and consideration of specified mitigating factors.

216.    The Psychemedic Defendants had knowledge of Plaintiff's contractual employment relationship and the disciplinary terms that governed it, because their testing and reporting were retained and used for the specific purpose of informing disciplinary decisions concerning Plaintiff's continued employment.

217.    Defendants intentionally and improperly procured a breach and/or wrongful termination of Plaintiff's employment contract by, among other things: (a) initiating HC testing before obtaining Plaintiff's consent; (b) spilling or destroying the retained A-sample, thereby eliminating confirmatory retesting; (c) applying non-standard or disputed cutoffs and interpretive criteria and failing to disclose material limitations; and (d) misstating or downplaying Plaintiff's negative head-hair result and multiple independent negatives, and framing communications to portray ingestion and to override the Department Trial Not-Guilty finding; and (e) relying on knowingly irregular, inaccurate and undisclosed forensic practices.

218.    The Psychemedics Defendants were strangers to Plaintiff's employment contract

and acted without justification or privilege; to the extent they claim agency for the NYC, they acted outside the scope of any legitimate interest and with malice and wrongful means that are not privileged.

219.    But-for and proximately because of the Psychemedics Defendants' conduct, the NYC Defendants breached and/or wrongfully terminated Plaintiff's employment contract, depriving him of the contractual benefits and protections guaranteed by that agreement.

220.    As a direct and proximate result, Plaintiff suffered pecuniary damages, including termination, lost wages and benefits, lost pensionable service, and other consequential economic losses to be proven at trial.

## COUNT XII- TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)

221.    Plaintiff repeats and reiterates each and every allegation set forth above with the same force and effect as if it were more fully set forth at length herein.

222.    Plaintiff had valid, identifiable prospective economic relationships and opportunities with third parties, including but not limited to: (a) advancement and continued placement in specialized NYPD assignments that require a clean disciplinary record; (b) remunerative off-duty detail and training opportunities administered by outside vendors/agencies; and (c) lateral or post-NYPD employment with law-enforcement and public-safety employers (including agencies and contractors requiring integrity clearances). These prospects were concrete and regularly available to similarly situated officers whose records were untainted.

223.    The Psychemedic Defendants knew of these expectancies and of the foreseeable impact their testing, reporting, and communications would have on Plaintiff's employment and

broader career prospects, because their services were engaged for the specific purpose of informing disciplinary decisions that determine such opportunities.

224.    The Psychemedic Defendants intentionally interfered with those prospective advantages by wrongful means.

225.    The Psychemedic Defendants acted with the purpose, or at minimum with knowledge, that their wrongful conduct would interfere with Plaintiff's prospective economic relationships, and they lacked justification or privilege to do so.

226.    But-for and proximately because of the Psychemedic Defendants' wrongful acts, Plaintiff lost and had impaired prospective opportunities, including termination from his position, loss of advancement and special assignments, and the foreclosure or material diminishment of future employment and licensing prospects in law-enforcement and related fields.

227.    As a direct and proximate result, Plaintiff sustained economic damages, including lost and diminished future earnings, benefits, and career opportunities, reputational harm, and other consequential losses to be proven at trial.

228.    Plaintiff seeks compensatory and consequential damages, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

### COUNT XIII- PROFESSIONAL NEGLIGENCE (FORENSIC TOXICOLOGY) / MALPRACTICE (AGAINST PSYCHEMEDICS CORPORATION AND RYAN PAULSEN)

229.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

230.    The Psychemedic Defendants held themselves out, and acted, as forensic toxicology professionals engaged to collect, preserve, test, analyze, interpret, and report hair-

sample results for use in NYPD disciplinary proceedings involving Plaintiff.

231.    In undertaking those services, the Psychemedic Defendants owed Plaintiff the professional standard of care applicable to forensic toxicology laboratories and practitioners performing employment-dispositive testing and reporting. That standard includes, without limitation: validated methodology fit for the intended purpose; documented, informed consent before initiating specialized testing; maintenance of chain of custody; preservation of confirmatory material sufficient to permit independent retesting; transparent disclosure of cutoffs, interpretive criteria, and material limitations/uncertainty (including the ingestion-vs-contamination problem); and accurate, complete reporting of both positive and negative findings.

232.    The Psychemedic Defendants breached the professional standard of care, including by: (a) initiating HC testing before obtaining consent; (b) knowingly or willfully spilling or otherwise destroying the retained A-sample, eliminating confirmatory retesting; (c) applying non-standard or disputed cutoffs and interpretive criteria for HC and benzoylecgonine and failing to forthrightly disclose material limitations/uncertainty; (d) misstating or downplaying Plaintiff's negative head-hair result and multiple independent negatives and the scientific meaning of any positive findings; (e) failing to ensure proper validation for the asserted proposition (ingestion vs. environmental contamination) and to disclose method limits; and (f) otherwise deviating from accepted evidence-handling, testing, interpretation, and reporting practices in a manner foreseeably producing an inaccurate and unfair adjudicative record.

233.    At all relevant times, Defendant Paulsen acted within the scope of his professional duties for Defendant Psychemedics; Defendant Psychemedics is therefore

vicariously liable under respondeat superior for Defendant Paulsen's professional negligence, and independently liable for its own negligent policies, supervision, and quality assurance failures that enabled the breaches described above.

234.    The Psychemedic Defendants' professional departures were a direct and proximate cause of Plaintiff's injuries through a foreseeable lost-evidence and misinformation chain: destruction of the A-sample eliminated confirmatory testing; undisclosed/non-standard interpretive criteria and incomplete reporting skewed the scientific picture; those defects materially impaired Plaintiff's ability to present exculpatory proof at the Department Trial and on Defendant Commissioner Sewell's review; and decision-makers relied on the tainted record in terminating Plaintiff.

235.    As a direct and proximate result, Plaintiff suffered pecuniary damages, including termination of employment, lost wages and benefits, loss of pensionable service and seniority credits, and other consequential economic losses to be proven at trial, as well as reputational harm and loss of future earning capacity.

236.    Expert testimony will establish the applicable forensic-toxicology standard of care, the Psychemedic Defendants' deviations from that standard, and causation of Plaintiff's losses.

237.    Plaintiff further seeks appropriate spoliation remedies for the destruction of the retained A-sample, including an adverse-inference instruction and related sanctions, in addition to compensatory damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally where permitted by law, ordering Defendant City of New York and Defendant NYPD to immediately and retroactively reinstate Plaintiff to his job title of Sergeant, and adjust

Plaintiff's wage rate, salary, bonuses, seniority, and benefits to levels that he would enjoy but for Defendant City of New York and Defendant NYPD's unlawful policies, customs, practices, and conduct; awarding all compensatory damages including back pay, front pay, lost wages, lost benefits, and restoration of pensionable service/credit; consequential and special damages (including out-of-pocket costs and loss of future earning capacity/opportunities); reputational damages; emotional-distress/mental-anguish damages; punitive damages against non-municipal defendants and individual defendants sued in their individual capacities; nominal damages where appropriate; pre- and post-judgment interest; reasonable attorneys' fees and costs (including expert fees) as permitted by law; and such other and further relief as the Court deems just and proper.

Dated : New York, NY

      November 2, 2025

      Carter Reich.
      Of Counsel to Yassi Law PC
      Local Counsel for:
      Helder santos
      106 W. 32nd St. Suite 123
      New York, NY 10001
      (917) 615-0978